So you're doing double duty today? Yes, sir. May it please the court again, again, I'm still Keith Ruttman on behalf of Ms. Box Kuhlken in this instance. Your Honor, in February of 2016, an unarmed, non-resistant crime victim, who just happened to be basically a soccer mom, exercised her- Volleyball mom. Volleyball mom. Come on, let's get the sport right. Well, I've never quite heard that stated, so I thought I would just generalize it, but yes. It's our position she was exercising her First Amendment right under City of Houston v. Hill to simply ask the officer, what's the purpose of your engagement with me? This is a really interesting case because it arises out of a dispute over a parking space, right? Yeah, we made a federal case- For two different versions of what happened, both sides called law enforcement. That's correct. So when the officer shows up, he's heard one side say, this woman drove into this parking space and ran over my foot and then tried to get away. That's one side. Right. And the other side was this woman said, who tries, Ms. Fox, your client, is trying to pull into a parking space so she can watch her daughter compete in a volleyball match. And there's a guy sitting in the parking space, presumably saving it for someone else. That's exactly right. And she drives up, doesn't hit him, but he sticks his foot out and kicks the underside of the car. She drives away and calls 911. Right. So that's the two-sided information that the officer had when approaching the scene. That's correct, Your Honor. That's exactly right. And what did he do wrong? Well, one important fact that I would urge the court to consider in that respect is that she called first and her call was live. Any difference? I think it does because by the time the dispatch sent out the call on the second one, the officer was en route and knew that there had already been a call from someone purporting to become a victim. So that sets up the scenario that the court describes. But at least when he leaves the station, he believes he's going there to assist her. And that's what she testified happened. By the time the officer gets there, dispatch has told him about the other call, right? En route, yes, prior to arrival. So when he arrives at the scene, he's got this direct-on disputed facts as to what happened over this parking space. That's correct. And that's one of the reasons why we withdrew any claim of an unlawful detention because she had no intention of leaving the scene. She wanted to be there to provide the officer with the information she possessed in order to resolve this situation. I don't think she was looking for anyone to be arrested. She just did what she was told. She was told to leave the scene by dispatch. She did. She saw the officer come back. She comes to the scene, the officer's there, and he asks her for identification. Well, that's not disputed. What's disputed is when he asked for identification and the manner in which he did so. She testified that she approached him and said, hi, I'm glad you're here to help me. You know, and that's when he immediately demanded identification. She was a little bit taken aback and, excuse me, what for? And almost immediately he's threatening her with detention. What additional standard did the officer violate by asking her for her identification? None. He has the perfect right to ask for identification under this court's precedent. It's not a crime in California to demand, refuse to demand, produce identification upon demand unless a statute requires it. In this case, Vehicle Code Section 2000, 2001 and 2003 do set that standard. But those statutes also require under California precedent from the California Supreme Court that there be probable cause of some knowledge on the part of Ms. Fox that she caused an injury. That can be direct knowledge or constructive knowledge. And the officer at that point in time had really no basis at all to assume that she had knowledge of any injury because all he knew is what she reported to 911 and what Mr. Platt's wife reported to 911 as well. But he was certainly on the scene talking to Mr. Platt before she arrived and was able to see that there was no signs of any visible injury on his breast. Has the other side asked for ID? I don't know. I probably should have asked that, but I don't seem to recall asking that particular question at the deposition. But I would assume he would be because it just seems reasonable for an officer to do so. What happened when she refused to produce identification? Well, she said she testified that she didn't refuse to produce identification as much as she didn't produce it quickly enough in response to his demand. So he threatened her with a taser and ultimately grabbed for her purse, at which point, taking it back, she— But the officer's not there to negotiate. No. I mean, he's there to—he gets conflicting calls, and I don't think it makes any difference who called first. If you create a rule that says he who calls first is more credible, everyone will run to expect that a lawful order will be complied with, and it's a pretty de minimis thing to request when you have one side saying there was an assault with a motor vehicle to ask the other side to produce some identification. That's correct, Your Honor. But it's also important to remember that she identified herself by name and phone number to 911 when she called it in. She went up to the officer and told him, I'm glad you're here. I'm the one who called. So he had—there was some basis on the part of law enforcement as a collective whole under the collective knowledge doctrine to know who this woman was. But there is no—absolutely no set rule, or we're not asking the court to find a rule that whoever calls first should be believed. That's simply a fact that needs to be taken to account. Just to be clear, are you saying in this case that there was no lawful basis to request her driver's license? I'm sorry. Could the court repeat the question? Are you saying that in this case there was no lawful basis for the officer to request her driver's license? Yes, because he had no facts to indicate probable cause that she had knowledge she had injured anybody based upon the manner in which she described the call to 911. Why wasn't he entitled to credit the other version of events? He would be entitled to credit—  Even if she did run over someone's foot, there still has to be probable cause that she knew she ran over someone's foot. And the way she described it, he sat down—I believe Judge Hawkins introduced the facts— he sat down in her car and kicked the undercarriage of her car. And even the investigating officer said, this story sounds kind of hokey. I mean, how possibly could he have his foot run over if he's sitting down in the middle of a parking spot? The tires are going to be over the side. But be that as it may, we're not contending that the officer didn't have a right to investigate. Ms. Fox wanted him there to investigate. She called the police. Right, so he's demanded her identification. And at that point, things go south a bit. Very quickly, Your Honor, yes. So where's the constitutional violation at that instance? Well, the court's precedent has established that failure to comply with rapid haste in obeying a police officer's order is not grounds for an arrest for a 148. And that's what he testified. He arrested her for the resisting 148 obstruction, not for the vehicle code violation. And if the facts as she posits them are simply that he failed, she failed to respond quickly enough, then that would be the constitutional violation. I forgot to request rebuttal time, and I see I have a minute 15 left. Can I reserve the balance of that time?  Okay, thank you very much, Your Honor. Good morning, and may it please the court. My name is Fernando Kish, and I represent the appellees, County of San Diego, and Sheriff's Deputy, Darren Smith. This case now boils down to two principal claims. Unlawful arrest and excessive force in violation of the Fourth Amendment. The trial court ruled in favor of defendants on summary judgment on both of those claims and all of the claims asserted by the appellants in this case. In doing so, the trial court ruled that the undisputed facts established that Deputy Smith had probable cause to arrest the appellant and that the force used to effect that arrest was reasonable under the circumstances. In reaching this conclusion, the trial court relied principally on six undisputed material facts. Fact number one, Deputy Smith was dispatched to respond to a parking lot dispute that culminated with one party accusing the other of running over his foot with her car. Essentially, Deputy Smith was called to investigate a potential assault with a deadly weapon. And that was later disproved. That's correct, Your Honor. The plaintiff's version of events turned out to be the correct one. In certain respects, yes, Your Honor. As to the dispute between the two. Yes, I would say that there was a dispute of the parking lot and that two parties had different versions. One party claimed that his foot had been run over. That turned out not to be true. That's correct. Deputy Peterson, who is not a party to this lawsuit, conducted that part of the investigation and made that determination. The other party said I was pulling into the parking space. This guy was sitting there blocking my entrance. I stopped before my vehicle made contact with him and he kicked the underside of my car. That turned out to be correct. Yes, Your Honor. One additional fact is that the appellant also contends that her car at some point made contact, I think, with his hips and thighs. She contended that the third party, Mr. Platt, initiated that contact. Was Mr. Platt asked for identification? That would be outside of the record. With the court's permission, I can address that if you want me to. It's not in the record. It's not in the record, Your Honor. But Deputy Peterson conducted that part of the investigation. Deputy Smith, who is the— I take it it's routine in a situation like this where you have conflicting stories to seek ID from both sides. Yes, Your Honor. And both parties, if there was a continuing antagonism, would be separated, Your Honor. Was Mr. Platt ever prosecuted for making a false report? It's not in the record, Your Honor, and not to my knowledge. And was he taken down and handcuffed? He was sat down on the curb, Your Honor, and he— Was he handcuffed? Not to my knowledge, Your Honor. That's also not in the record. Forcibly taken down to the ground? No, Your Honor. There's also nothing in the record that suggests Mr. Platt refused to cooperate in any way with the questions that were asked of him by Deputy Smith or Deputy Peterson. Deputy Smith's interaction with Mr. Platt lasted only a matter of seconds before an appellant showed up on scene, and his entire interaction with Mr. Platt was just those 15 to 20 seconds. Did Mr. Platt ever admit that what Ms. Fox was saying was true? That's not in the record, Your Honor. So we have a circumstance where police officers are trying to sort out the situation, but the two accusers were treated very differently. Would you agree? I agree, and with court permission, I can answer why they were treated differently. Well, certainly go ahead, but my perception is— But yes, summarily stated, that's what happened. Okay. What about the threatening her, threatening to tase her if she didn't provide her driver's license? Is that a reasonable exercise of force? In this context, yes, Your Honor. Deputy Smith made that verbal threat with the intent to compel compliance. Based on his training and experience, threatening someone with the possibility of being tased or any other physical force typically compels compliance from a suspect, and that's what he was intending to do in this instance. And he called her sweetie, right? He did not, Your Honor. If we look at the video, the person that's calling her sweetie is the off-duty officer that assisted in handcuffing the appellant. So one of the officers who was handcuffing her called her sweetie. Get up, sweetie. I think that's what the video shows, yes, Your Honor. After Deputy Smith arrived on scene, he had an interaction with Mr. Platts that lasted only 15 to 20 seconds. However, in that interaction, what's undisputed is that Mr. Platts told Deputy Smith that his foot was run over and identified the appellant as she was walking as the person who had run over his foot. At that point in time, Deputy Smith had the justification to detain the appellant in order to investigate her involvement in the parking lot dispute and the possibility that she used her car to run over this man's foot. And that justification to detain her existed until he was able to complete that investigation in a reasonable amount of time. That amount of time was delayed because of the interactions and the resistance that was offered by the appellant in this case. She was taken into custody and booked? She was cited and released, Your Honor. Was she booked? That's not in the record, Your Honor. Okay. But she was released? Yes, Your Honor. Did she miss her daughter's volleyball match? That's also not in the record, but she arrived back on the volleyball location at approximately 1245. The record reflects that she was anticipated being there until 2 p.m. that day. Deputy Smith then requested that appellant provide her identification. He refused. She questioned why. In argument this morning and in their briefs, the appellant argues that there's a First Amendment right that she had in order to question why. But she may verbalize anything she wants. The question isn't that she verbalized something or said something to the deputy that the deputy took issue with. The point is that the law requires her to provide identification under these set of circumstances because of the vehicle code that both parties agree apply in this context. Now, the appellant contends that there's a question of fact as to whether or not Deputy Smith had probable cause as to the appellant's knowledge of the injury. However, the undisputed facts establish that appellant heard the other party's wife call the police, and she heard her yell at her, What are you trying to do? Are you trying to kill my husband? So there was probable cause at that point for Deputy Smith to believe that there was an incident that could lead to conviction under this vehicle code. Now, evidence of conviction isn't necessary. It's just probable cause, and those are two different things. And I think that the appellant's argument misses the point on that issue. Did Officer Smith or the off-duty officer who helped in the handcuffing know prior to these events either of the participants? No. Have any contact with them? There's nothing to indicate that in the record, Your Honor. Deputy Smith also warned the appellant that physical force would be used if she did not comply. Appellant contends that that warning came in the form of a threat of physical force. Deputy Smith contends that he also said that he would have to sit in the back of the patrol car. Now, that's a minor discrepancy. Deputy Smith agrees that he threatened a taser, but regardless of the force that was threatened, there was a warning given to the appellant that force would be used if she didn't comply. And that's an important consideration in determining whether there was a constitutional violation of excessive force in this case. And the sixth important undisputed fact in this case is that appellant physically resisted being detained. She resisted being moved to the back of the patrol SUV. This is confirmed by her own testimony. This isn't Deputy Smith's version of facts. This is appellant's own testimony or the video, which cannot be controverted. The appellant resisted Deputy Smith's efforts to grab her purse. She resisted the efforts of the officer to guide her to the patrol car. She resisted being handcuffed, and that resistance is captured on video. And what threat did she pose? At that point, Deputy Smith was the only officer on scene. He did not know that there was an off-duty officer also present. He didn't learn that until there were. Are you really contending that she posed a threat to the officer? At that point, the threat that she posed was the vicinity to Mr. Platts and a re-ignition of the volatile situation. I see that my time is up. Unless there are other questions? Thank you, Counsel. Thank you, Your Honors. Chief Judge Thomas, to follow up on your last point, it's also important to remember that the officer testified that he did not view the crowd as posing any sort of threat to him whatsoever. They were just a bunch of volleyball moms and dads who were just observing a police event. Doesn't police safety depend upon the police being able, in the sort of post-escalation-of-force world, to be able to expect citizens to comply with a lawful request? Once you sort of go down that slippery slope, then the police become less safe because people challenge their authority. Well, Your Honor, I would answer that question this way. That's a fundamental constitutional question, is how do we balance the need between police effectiveness and safety versus citizens' rights to be free of Fourth or First Amendment intrusions on their liberties? That's always a balancing test. The Court's Fourth Amendment jurisprudence says so. In this particular instance, Ms. Fox wasn't going anywhere and wanted to talk to Officer Smith and provide him with the information that she had. For the excessive force prong that I didn't get to address, I'd urge the Court to consider again Winterrod v. Nelson and Blankenhorn v. County of Orange. Thank you again so much. Thank you, Counsel. Thank you both for your arguments this morning. And the case is just argued to be submitted for decision.
judges: Hawkins, Thomas, Pregerson